UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
at CHATTANOOGA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | No. 1:11-cr-75 |
| v. | ) | |
| | ) | *Collier / Lee* |
| MARCUS MURPHY | ) | |

**REPORT AND RECOMMENDATION**

Before the Court is the motion filed by Defendant Marcus Murphy ("Defendant") seeking to suppress evidence, specifically a revolver and ammunition, seized during a warrantless search of his residence [Doc. 11].[1] After carefully considering all of the evidence and the parties' arguments, I find no constitutional violation occurred, and I **RECOMMEND** that Defendant's motion to suppress be **DENIED**.

**I.     EVIDENCE**

At the hearing, the government offered the testimony of Wayne Jordan ("Officer Jordan"), a patrol officer with the Jasper Police Department. Defendant offered the testimony of Anthony Gamble ("Deputy Gamble"), a deputy with the Marion County Sheriff Department, in addition to testifying himself.

**A.     Officer Jordan's Testimony**

Officer Jordan testified as follows. On August 13, 2011, Officer Jordan was contacted by Deputy Gamble in connection with a home burglary investigation. Defendant was believed to be the purchaser of certain property stolen during the burglary, including a handgun. Officer Jordan,

---

[1] The motion was referred for a report and recommendation pursuant to 28 U.S.C. § 636(b)(1)(B) and (C) [Doc. 12]. The government filed a response in opposition to the motion [Doc. 14]. An evidentiary hearing on the motion was held on December 6, 2011. The parties also filed post-hearing briefs in support of their respective positions [Doc. 17 & 19], which have been fully considered.

who knew Defendant from previous encounters, decided to drive by Defendant's residence. Officer Jordan was in his police uniform and was driving a marked patrol car by Defendant's residence when he saw Defendant standing outside. Officer Jordan let Deputy Gamble know that Defendant was at home. Officer Jordan then made contact with Defendant outside of his residence, near Defendant's open front door. Through the open door, Officer Jordan could see some of the stolen items on Defendant's bed in plain view.

Officer Jordan told Defendant that Jeff Poe ("Poe") said that various items stolen by Poe had been sold to Defendant. Officer Jordan asked Defendant if he knew the items were stolen. Defendant admitted that he bought some items from Poe but said he did not know they were stolen. Officer Jordan told Defendant he was not there to arrest him, but he was there to recover the stolen items. Officer Jordan told Defendant his cooperation would be beneficial. Defendant said the items Poe sold him were in his apartment and he walked into his apartment to retrieve the items. Officer Jordan followed Defendant into his apartment, which is a small, one-room efficiency apartment.

Initially, Officer Jordan testified Defendant opened the front door wide enough for both of them to enter the apartment. Officer Jordan later clarified that he asked for consent to go inside and recover the stolen items and Defendant agreed, stating that because he was a convicted felon, he did not want to have any stolen items in his residence. Officer Jordan consistently and unequivocally testified Defendant never gave any indication he wanted Officer Jordan to stay outside while Defendant went into his apartment to retrieve the stolen items, never asked Officer Jordan to leave, and never asked for a warrant.

After Officer Jordan and Defendant had entered the apartment, Deputy Gamble arrived and entered the apartment through the still open door. Both officers again told Defendant they were not

2

there to arrest him; they just wanted to recover the stolen items. Defendant again said he did not realize the items were stolen and said he would cooperate in the recovery of the items. Deputy Gamble asked Defendant if he was a convicted felon, and Defendant admitted he was stating that was the reason he did not want to have any stolen items in his residence. Defendant helped the officers collect stolen items in plain view.

Defendant had some boots that he obtained from Poe that were not on the officers' list of stolen items, but Defendant told the officers they should take the boots as well because he did not want to have anything from Poe in the apartment. After the stolen items and boots were collected, the stolen handgun was still missing and the officers asked Defendant about the gun. Defendant said he did not know anything about the stolen gun. Deputy Gamble again told Defendant they were not there to arrest him on the gun; they just wanted to recover it. Defendant again stated he did not know anything about the stolen gun. Deputy Gamble then asked for consent to search for the stolen gun and Defendant indicated to the officers that they could search for the gun by again stating he wanted to cooperate. Deputy Gamble ran his hand along the top of a tall, armoire-type cabinet and felt a gun magazine or clip.[2] He retrieved a magazine that could be used with the type of gun stolen by Poe.

After Deputy Gamble found the magazine, Officer Jordan went into the bathroom and found a loaded revolver with 30 rounds of ammunition hidden in a plastic bag in a basket. This revolver was not the stolen handgun. Officer Jordan did not let Defendant know he found the revolver, but he signaled for Deputy Gamble to speak with him so he could alert the officers to the revolver. Other officers had arrived at Defendant's house by this time. Eventually, another officer also found

---

[2] The witnesses used both the terms "clip" and "magazine" to describe what was found over the cabinet. For simplicity, I will refer to what was found as a magazine.

3

the revolver in the bathroom, but Officer Jordan told him he was already aware of the revolver and not to retrieve it yet.

Defendant also made a phone call to a person he said was his father. Officer Jordan spoke to Defendant's father and explained they were recovering stolen items that Defendant had purchased. Neither Defendant nor the person on the phone ever indicated that Defendant did not want police to search Defendant's apartment without a warrant.

As the officers had not recovered the stolen gun, and based on information Deputy Gamble had, the officers began the process of searching a neighbor's home but did not find the stolen gun there either. Officer Jordan also traveled to a neighbor's place of employment to obtain information about the stolen gun.

Sometime after Officer Jordan returned to Defendant's apartment, Officer Jordan asked for consent to search Defendant's car. Defendant agreed, saying there was nothing in the car, and gave Officer Jordan the keys to the car. When the search of the car did not result in finding the stolen gun, Officer Jordan told Defendant he had found the revolver in the bathroom. Defendant volunteered that he was holding the revolver for a friend. Officer Jordan told Defendant he would not be arrested by him for the revolver that day, and again told Defendant he merely wanted to find the stolen gun. Officer Jordan also told Defendant that he would be arrested at some point for the revolver and ammunition and that his cooperation in finding the stolen gun would help. Defendant said he would try to help the officers find the stolen gun.

Defendant was arrested that day on an outstanding warrant that Officer Jordan learned of toward the end of the search. At the Sheriff's Department after his arrest, Defendant gave a statement indicating that Poe had shown him the gun outside his apartment, but again stated he had

4

never possessed it.

Officer Jordan had prior encounters with Defendant in criminal cases and knows him to be of average intelligence. Officer Jordan did not give Defendant a written consent to search form and did not document Defendant's consent to search. Officer Jordan saw no reason to use a written form. He had at least three discussions about the stolen items with Defendant wherein Defendant gave consent to search. He described the Defendant's multiple consents and cooperation as being fast moving. Officer Jordan denied ever hearing Deputy Gamble tell Defendant that he could search without Defendant's consent or a warrant. Officer Jordan described Defendant as being fully cooperative and interested in getting all of the stolen items out of his residence.

      **B.**      **Deputy Gamble's Testimony**

Deputy Gamble testified as follows. Poe confessed to a home burglary and said the stolen items were sold to Defendant. Deputy Gamble asked Officer Jordan, who knew Defendant, to help him with the investigation. Deputy Gamble arrived at Defendant's residence a few minutes after Officer Jordan. When Deputy Gamble arrived, Officer Jordan was already in the residence with Defendant. Deputy Gamble walked into the apartment, introduced himself to Defendant, and explained he was there to recover items stolen by Poe. Most of the stolen items were in plain view on the bed.

Deputy Gamble asked Defendant if he was currently on probation and Defendant admitted he was. Deputy Gamble then said that he was most concerned about recovering a stolen handgun. Defendant denied having the stolen gun. Deputy Gamble asked Defendant if the officers could search for the stolen gun. Defendant responded that he did not have the stolen gun but that the officers could look for it. Deputy Gamble never told Defendant that a search could be conducted

5

without Defendant's consent because stolen property was in plain view. Although he had a form to use when obtaining consent to search, Deputy Gamble did not ask Defendant to sign one.

After getting consent to search for the gun, Deputy Gamble felt on top of an armoire-type cabinet that was taller than he was and found a magazine that could be used with the stolen gun. About the same time, Officer Jordan indicated to Deputy Gamble that he found a revolver and ammunition in the bathroom, but it was not the stolen gun. Deputy Gamble called Poe on the phone and Poe said he left the stolen gun with Defendant who had taken it to a neighbor.

Defendant never mentioned a search warrant; instead, he fully cooperated with the officers. Defendant gave a statement about seeing the stolen gun later when he was in custody at the Sheriff's office.

### C. Defendant's Testimony

Defendant testified as follows. He was outside working on his car when Officer Jordan approached him. Officer Jordan told Defendant that he was there to investigate stolen property and that he had information Defendant had purchased some stolen property from Poe. Defendant told Officer Jordan he would go get the property he bought from Poe and that he did not know the property was stolen. Officer Jordan followed Defendant into the residence without asking for permission to enter or to search. Defendant did not protest or tell Officer Jordan to leave. Officer Jordan told him what was on the list of stolen property and Defendant began to gather the items, some of which were already on the bed.

Deputy Gamble arrived and asked about the stolen gun. Deputy Gamble asked for consent to search for the gun, and Defendant said, "No." Deputy Gamble responded that they could search anyway because Defendant was in possession of stolen property. The officers then began to search

6

even though Defendant specifically denied consent to search. Defendant could not do anything about the search because they were the police and he did not want any problems. When they did not find the stolen gun, the officers started to pressure Defendant for information about the stolen gun. Defendant kept telling the officers he did not have the gun and he then called his father because he was nervous. Officer Jordan talked to his father.

Defendant did not believe he could do anything about the police being there since they ignored his refusal to consent. Since he believed he could not stop the search, he cooperated fully. Defendant never asked for a search warrant. Defendant cooperated in giving the stolen items to the officers and in offering to help located the stolen gun. Defendant did give consent to search his car when asked about that search. When told the revolver was found, Defendant said the revolver was a friend's gun. Eventually, Defendant told the officers that Poe had showed him the stolen gun outside. Defendant testified that he had "no idea" how the magazine got into his apartment or on top of his cabinet.

Defendant was thirty-one years old at the time of the search. He had earned both a high school diploma and a welding degree from a technical college. He had no difficulty understanding the officers on the day of the search. Defendant has been arrested many times in the past. He has been represented by counsel with respect to at least five convictions, both felony and misdemeanor, mostly for drugs but also a weapon-related conviction. Defendant also had prior experience with the execution of a search warrant at his residence, which resulted in a felony conviction. Defendant was on parole on the day at issue. Defendant stated he had turned his life around due, in part, to his participation in a drug recovery program and his completion of welding school.

## II. ANALYSIS

### A. Standards

The Fourth Amendment provides "[t]he right of the people to be secure in their . . . houses . . . against unreasonable searches and seizures, shall not be violated . . . ." U.S. Const. amend. IV.[3] The Supreme Court has long recognized that "a man's home is his castle" and, specifically, that a right to be secure in one's home from intrusion is embodied by the Fourth Amendment. *Minnesota v. Carter,* 525 U.S. 83, 94 (1998) (Scalia, J., concurring) (emphasis omitted); *see United States v. Nelson*, 459 F.2d 884, 885 (6th Cir.1972) (noting that the Fourth Amendment exists to ensure the inviolability of an individual's home). The Fourth Amendment prohibits a search of a suspect's residence without a proper warrant except in limited circumstances, such as a search conducted pursuant to consent. *See Florida v. Royer,* 460 U.S. 491, 497 (1983); *Schneckloth v. Bustamonte*, 412 U.S. 218, 219 (1973)).

"It is the Government's burden, by a preponderance of the evidence, to show through clear and positive testimony that valid consent was obtained." *United States v. Hinojosa*, 606 F.3d 875, 881 (6th Cir 2010) (internal quotation marks omitted). Consent is valid only if it is voluntary – i.e., "unequivocal, specific and intelligently given, [and] uncontaminated by any duress or coercion." *United States v. Moon*, 513 F.3d 527, 537 (6th Cir. 2008).

### B. Consent

In his post-hearing brief, Defendant concedes that most of the stolen property lay in plain

---

[3] "[A] defendant claiming that a search violated his Fourth Amendment rights has the burden of demonstrating that he had a legitimate expectation of privacy in the place that was searched." *United States v. Talley*, 275 F.3d 560, 563 (6th Cir. 2001) (citing *United States v. Sangineto-Miranda,* 859 F.2d 1501, 1510 (6th Cir. 1988)). It is undisputed that Defendant had a legitimate expectation of privacy in the residence.

view on the bed, on shelves, and in places which could be seen as someone stood permissibly inside the apartment or outside with the door open. Citing to *Minnesota v. Dickerson*, 508 U.S. 366, 375 (1993), Defendant acknowledges that where contraband is left in open view and observed by police from a lawful vantage point, there is neither an invasion of privacy nor a search under the Fourth Amendment. Defendant argues only that the warrantless search for the stolen gun, which resulted in a seizure of the magazine and revolver that were not in plain view, was improper under the Fourth Amendment.

Defendant focuses his argument on the officers' testimony regarding his alleged consent. He argues the testimony of the officers indicates only that when the officers asked for permission to search the apartment for the stolen gun, Defendant responded that he wanted to cooperate, he wanted the officers to take all of the stolen property from his apartment, and he did not want any trouble with the law–but he did not respond "yes." Defendant concedes that when examined about whether Defendant consented to the search, both officers replied Defendant said, yes, he wanted the stolen property removed and Deputy Gamble testified that Defendant said to go ahead and look. Defendant claims, however, that such testimony does not establish he gave consent to the warrantless search of his residence; but rather, shows only that he acquiesced to a claim of lawful authority.

The government responds that Defendant admits he allowed the officers to look around his apartment for stolen items, including a firearm; that Defendant never attempted to limit the officers' search to a cursory glance or the main room of his tiny apartment or put any other limitations on the search; that during the search Defendant was free to engage in a phone call and wander around the apartment and yard; and that Defendant admittedly later gave the officers consent to search his

9

vehicle. The government also emphasizes Defendant's familiarity with the criminal justice system.

Even though Defendant did not directly rely upon his own alleged refusal to consent in his post-hearing brief, the first issue to be determined with regard to Defendant's motion to suppress should be Defendant's consent, or lack thereof. Defendant testified that he specifically told Deputy Gamble he could *not* search for the stolen gun and Deputy Gamble replied that law enforcement could search anyway because of the stolen property in plain view. Both officers testified to the contrary. The resolution of whether Defendant actually refused to give consent turns on a credibility determination.

I **FIND** Defendant's testimony that he directly refused consent to search for the stolen gun is not credible for several reasons. First, Defendant's alleged refusal to consent is not entirely consistent with his admitted actions that day, such as his cooperation in gathering stolen items (and the boots) and his agreement to the search of his car. Second, Defendant did not protest the officers' presence in his home in any way. For instance, Defendant engaged in a phone call with his father, but did not complain to his father that the search was taking place in spite of his alleged refusal to consent to the search. Defendant had a significant amount of prior interaction with law enforcement and was aware of his rights. It seems unlikely he would simply say "no" once to a request for consent and then cooperate fully and have a conversation with his father without a single protest to anyone. Finally, other aspects of Defendant's testimony are similarly incredible. For example, it is unlikely that Defendant has no idea how the magazine got on top of his cabinet.

I also **FIND** the officers' testimony to be far more consistent and credible than Defendant's self-serving statement that he specifically told the officers he refused to give consent. The testimony of Officer Jordan and Deputy Gamble was not impeached or discredited, although it was at times

10

Case 1:11-cr-00075-TRM-SKL    Document 20    Filed 01/10/12    Page 10 of 15    PageID #: 52

difficult to follow their sequence of events. While it would have been more prudent to use a written consent form to obtain consent from Defendant, the failure to obtain written consent does not make the officers' testimony less than credible. Considering the manner, demeanor and substance of all of the testimony, I **FIND** the officers' version of events to be far more credible than Defendant's version. As a result, I **FIND** Defendant did not refuse to give consent to a search for the stolen handgun.

According to the parties' briefing, an issue remains as to whether Defendant merely acquiesced to the authority of the officers when they requested consent. This argument is troubling because it ignores Defendant's discredited claim that he *refused* consent. Defendant did not claim he acquiesced in giving consent because he felt he had no authority to stop the search. Instead, he claimed he specifically *refused* to give consent and then merely cooperated with the officers without further protest because he was helpless to stop the officers after Deputy Gamble told him he could search in spite of Defendant's refusal to consent. In other words, and although ignored by the parties, this is not a case where Defendant claims he acquiesced to the authority of the officers requesting permission to search because he thought resistance was futile, this is a case where Defendant claims he resisted by saying "no," but the officers searched anyway.

In support of Defendant's claim that the evidence elicited from the officers only proves Defendant simply acquiesced to the officers' authority, Defendant cites to *United States v. Worley*,

11

193 F.3d 380 (6th Cir. 1999).[4] In *Worley*, the Court of Appeals for the Sixth Circuit ("Sixth Circuit") held that the government failed to meet its burden of proof that a defendant's consent was given voluntarily where, in response to officers' request to search, the defendant stated, "you've got the badge, I guess you can." *Id*. at 386. Here, the government argues Defendant's consent was given freely and voluntarily, and was not merely a response conveying an expression of futility or acquiescence as was the case in *Worley*. The government also cites to *United States v. Walls*, 116 F. App'x 713, 717 (6th Cir. 2004), where the Sixth Circuit held a defendant's statement of "go ahead" was not mere acquiescence to a police officer's claim of lawful authority to search, so as to preclude a finding that defendant freely and voluntarily consented to a search.

Under *Worley* and its progeny, the government has the burden to show Defendant's consent "was an unequivocal statement of free and voluntary consent, not merely a response conveying an expression of futility in resistance to authority or acquiescing in the officers' request." *Id*. at 386. I **FIND** the government has met that burden and Defendant's Fourth Amendment argument fails because the evidence demonstrates Defendant knowingly and voluntarily consented to the search. Contrary to the implications of Defendant's argument, there are no magic words required for valid consent. Consent to a search "may be in the form of words, gesture, or conduct." *See e.g., United States v. Carter*, 378 F.3d 584, 587 (6th Cir. 2004) (quoting *United States v. Griffin*, 530 F.2d 739, 742 (7th Cir. 1976)); *United States v. Davis*, 283 F. App'x 370, 373-74 (6th Cir. 2008). Even if the

---

[4] As in *Worley*, in this case there is no claim or proof of overt duress or coercion and Defendant's age, intelligence, and education indicate an ability to knowingly and voluntarily consent. Defendant is not actually arguing his consent was coerced, no doubt because he testified he refused to consent to a search for the gun after the items in plain view were collected. Defendant's testimony indicates he certainly knew he had the right to refuse consent and even did so. As noted above, Defendant's story, although unbelievable, clearly indicates it was only after his alleged lack of consent was ignored that he believed resistance to be futile.

12

officers' testimony is construed to mean Defendant did not specifically say "yes" to the officers' requests for consent, a specific "yes" response is not required. I **FIND** Defendant's words and actions, as testified to by the officers, constitute a valid consent to search for the stolen handgun.

In determining whether Defendant's consent was voluntary, I have considered, *inter alia*, Defendant's characteristics, including his age, his education, his extensive experience with the criminal justice system, the lack of any evidence that Defendant was advised of his constitutional rights, and the length and nature of his encounter with the officers. *See Schneckloth*, 412 U.S. at 226. While Defendant's consent was not prudent under the circumstances, the Fourth Amendment does not exist to protect criminal suspects from their imprudence; it protects them only from unreasonable police conduct. *See United States v. Lazar*, 604 F.3d 230, 237 (6th Cir. 2010) (explaining that the applicability of the exclusionary rule turns on the culpability of police conduct and the deterrent effect of exclusion). I **FIND** no unreasonable police conduct or coercion in this case based on the credible testimony. Further, under the totality of the circumstances, I **FIND** the government, by a preponderance of the evidence, put forth "'clear and positive' testimony that [Defendant's] consent was 'unequivocal, specific, intelligently given and not influenced by any duress or coercion.'" *See United States v. Salvo*, 133 F.3d 943, 953 (6th Cir. 1998) (quoting *United States v. Taylor*, 956 F.2d 572, 588 (6th Cir. 1992) (en banc)).

### C. Scope of Consent

It is also possible to construe Defendant's argument as including an alternative claim that the officers exceeded the scope of any alleged statement by him that they could "look around" when they searched the top of his cabinet and his bathroom. "The standard for measuring the scope of a suspect's consent under the Fourth Amendment is that of 'objective' reasonableness—what would

13

Case 1:11-cr-00075-TRM-SKL   Document 20   Filed 01/10/12   Page 13 of 15   PageID #: 55

the typical reasonable person have understood by the exchange between the officer and the suspect?" *Florida v. Jimeno*, 500 U.S. 248, 251 (1991).

Defendant's "scope" argument fails because the officers' testimony that Defendant gave them permission to look around for the stolen gun "would be understood by most people to involve a search" of anywhere in the residence a gun could be hidden, not merely permission to gaze about the residence for a stolen gun in plain view. *See United States v. Gant*, 112 F.3d 239, 242 (6th Cir.1997) (holding that "the use of the term 'look' placed no particular limitations on the scope of the search" and that "a reasonable person would understand that a request by a police officer to 'look' in a bag seeks consent to search the bag for evidence of illegal activity."); *accord United States v. Canipe*, 569 F.3d 597, 604-05 (6th Cir. 2009) (where suspect authorized police to "look" in his truck they could lawfully search truck including moving seats and opening containers). In addition, as in *Canipe* and based on the credible evidence, Defendant neither objected to, nor attempted to limit, the scope of the search while it was in progress. Therefore, I **FIND** the officers did not exceed the scope of Defendant's consent to search.

14

**III. CONCLUSION**

Accordingly, I **RECOMMEND**[5] that Defendant's motion to suppress [Doc. 11] be **DENIED**.

                                                    s/ *Susan K. Lee*
                                                    SUSAN K. LEE
                                                    UNITED STATES MAGISTRATE JUDGE

---

[5] Any objections to this report and recommendation must be served and filed within fourteen (14) days after service of a copy of this recommended disposition on the objecting party. Such objections must conform to the requirements of Rule 59(b)(2) of the Federal Rules of Criminal Procedure. Failure to file objections within the time specified waives the right to appeal the district court's order. *Thomas v. Arn*, 474 U.S. 140, 149 n.7 (1985). The district court need not provide *de novo* review where objections to this report and recommendation are frivolous, conclusive and general. *Mira v. Marshall*, 806 F.2d 636, 637 (6th Cir. 1986). Only specific objections are reserved for appellate review. *Smith v. Detroit Fed'n of Teachers*, 829 F.2d 1370, 1373 (6th Cir. 1987).